**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CHRISTOPHER BURNS, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:19-cv-553 (JCH) |
| | : | |
| v. | : | |
| | : | |
| JAMES C. ROVELLA, et al., | : | |
| Defendants. | : | SEPTEMBER 20, 2021 |
| | : | |

**RULING ON MOTION FOR SUMMARY JUDGMENT (DOC. NO. 125)**
**AND RELATED MOTIONS AND ORDERS (DOCS. NOS. 126, 129, 133, 135, 138)**

**I.      INTRODUCTION**

Plaintiff Christopher Burns ("Burns") brings this action against the Connecticut

Department of Emergency Services and Public Protection ("DESPP") and several of its

employees, pursuant to section 1983 of title 42 of the United States Code.  See Second

Am. Compl. (Doc. No. 78).  Previously, this court issued Rulings dismissing aspects of

Burns' initial Complaint, see Ruling ("Oct. 2019 Ruling") (Doc. No. 48) at 35-36, and

aspects of his First Amended Complaint, see Ruling ("Feb. 2020 Ruling") (Doc. No. 76)

at 29-32.  Burns' Second Amended Complaint asserts claims for violations of the family-

care provision of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.,

against DESPP, Commissioner James C. Rovella ("Rovella"), former Commissioner

Dora B. Schriro ("Schriro"), Colonel George F. Battle ("Battle"), and Colonel Stavros J.

Mellekas ("Mellekas"); and for violations of his right to due process of law, under the

Fourteenth Amendment to the U.S. Constitution, against Schriro and Battle.  See

Second Am. Compl. ¶¶ 89-111 (Doc. No. 78).

Before the court is the defendants' Motion for Summary Judgment, as to all claims.  See Defs.' Mot. for Summ. J. (Doc. No. 125); Mem. in Supp. of M. for Summ. J. ("Defs.' Mem.") (Doc. No. 125-2); Defs.' Reply Br. in Further Supp. of M. for Summ. J. ("Defs.' Reply") (Doc. No. 134).  Burns opposes this Motion.  See Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") (Doc. No. 132).  Defendants have also filed three Motions to Seal, along with a Motion for Leave to File Excess Pages for their reply brief. Mot. to Seal (Docs. Nos. 126, 129, 135); Mot. for Permission to File Oversized Reply to Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Mot. for Excess Pages") (Doc. No. 133). Plaintiff opposes the first Motion to Seal in part and the Motion for Leave to File Excess Pages in full.  Pl.'s Mem. in Opp'n to Mot. to Seal (Doc. No. 128); Pl.'s Mem. in Opp'n to M. for Leave to File Excess Pages (Doc. No. 137).  Finally, the court also addresses here its Order to Show Cause (Doc. No. 138) and plaintiff's response (Doc. No. 139).

For the reasons discussed below, the court grants the defendants' Motion for Summary Judgment.  It also grants their Motions to Seal and their Motion for Leave to File Excess Pages nunc pro tunc, and it seals plaintiff's unredacted Rule 56(a)2 Statement, Memorandum of Law, and Exhibits.

## II.    BACKGROUND

### A.    Local Rule 56 Statements

At the outset, the court finds it useful to address several serious deficiencies in plaintiff's Local Rule 56(a)2 Statement.

First, plaintiff's Statement goes well beyond the page limits set out in Rule 56. Before filing their Local Rule 56(a)1 Statement, defendants appropriately filed a Motion

for Leave to File Excess pages, which was granted by the court in advance of their

Motion for Summary Judgment.  See Defs.' Mot. for Leave to File Oversized 56(a)1

Statement in Supp. of Defs.' Mot. for Summ. J. (Doc. No. 123); Order Granting Mot. for

Leave to File Excess Pages (Doc. No. 124).  Defendants thereafter filed a 23-page Rule

56(a)1 Statement. Rule 56(a)2 limits plaintiff's response to "twice the length of the

moving party's Local Rule 56(a)1 Statement," and also allows for a separate "Additional

Material Facts" section of no more than nine pages.  D. Conn. L. Civ. R. 56(a)2.

Without leave of the court, plaintiff greatly exceeded the limits for his Rule 56(a)2

Statement by 40 pages.

Second, plaintiff inappropriately uses his denial of certain material facts brought

forth by defendants to attempt to introduce new facts into the record.  For example, in

paragraph 40 of their Local Rule 56(a)1 Statement, defendants make the simple

assertion that "Sgt. Asselin immediately notified Lt. DelGrosso, who notified his chain of

command, due to the criminal nature of [the steroid allegation made against the

plaintiff]."  Defs.' Local R. 56(a)1 Statement at ¶ 40 ("Defs.' R. 56(a)1 Stmt") (Doc. No.

125-1).  This statement is supported by the deposition testimony of both Asselin and

DelGrosso.  Id.  Plaintiff, however, purports to deny the paragraph in full.  Pl.'s Local R.

56(a)2 Statement at ¶ 40 ("Pl.'s R. 56(a)2 Stmt") (Doc. No. 132-1).  Rather than cite

evidence demonstrating that either Asselin did not notify DelGrosso or that DelGrosso

did not notify his chain of command, plaintiff instead uses his denial as an opportunity to

make broad-based attacks on the credibility of the individual who made the complaint

and the investigation writ large.[1]   To the extent that such allegations are appropriate, they should be included in the "Additional Material Facts" section of the Rule 56(a)2 Statement.  Instead, plaintiff has used his denials in an attempt to introduce new facts into the record and frustrate the nine-page limit in Rule 56(a)2(ii).

Third, plaintiff's Rule 56(a)2 Statement is replete with instances where he purports to deny or bring forth facts but does not do so properly, either because the denial is not responsive to the fact asserted or because the fact or denial is not supported by evidence that would be admissible at trial.  In paragraph 115, for example, defendants assert information about administrative actions taken against another sergeant accused of wrongdoing.  Defs.' R. 56(a)1 Stmt at ¶ 115.  The statement in that paragraph relates only to that Sergeant, saying that "his police powers were suspended after initial investigation and prior to his arrest.  He remains administratively assigned to the traffic unit with no police powers."  Id.  Plaintiff attempts to deny this fact, but none of the evidence he cites relates to the sergeant the paragraph is about – it is entirely focused on Burns.  Pl.'s R. 56(a)2 Stmt at ¶ 115.  Similarly, in the first paragraph of his "Additional Material Facts" section, Burns alleges that he "was suspended of his police powers by [ ] Battle and Schriro on July 30, 2018 in retaliation for his using FMLA leave for his daughter."  Pl.'s Local R. 56(a)2 Additional Material Facts at ¶ 1 ("Pl.'s Additional

---

[1] Nor are the allegations plaintiff makes in response supported by the record.  For example, plaintiff states that Asselin "kn[ew] that [the] complaint was false," and that "Asselin and Delgrosso [sic] made the complaint against plaintiff . . . to substantiate [their] goal of removing plaintiff from EDMC because of his use of FMLA."  Pl.'s R. 56(a)2 Stmt at ¶ 40.  In support of these statements, he cites to pages 60-62 of Bisson's deposition.  Id.  These pages say nothing of Asselin's knowledge about the veracity of the complaint, nor do they even mention FMLA, let alone support the claim that Asselin and DelGrosso wanted to remove plaintiff from EDMC in retaliation for his use of FMLA.

Material Facts") (Doc. No. 132-1).  In support of this allegation, he cites to paragraph 103 of his Affidavit.  Id.  Paragraph 103 of the Affidavit discusses a "Connecticut State Police Trooper" who "is suspected of using and distributing illegal steroids as part of a body building enterprise."  Aff. of Christopher Burns, Pl.'s Ex. 2 at ¶ 123 (Doc. No. 132-3).  This is not simply an errant citation: nowhere else in the Affidavit is there support for the allegation that Battle and Schriro suspended plaintiff of his police powers to retaliate against him for his use of FMLA.

        Indeed, a careful examination of plaintiff's Rule 56(a)2 Statement reveals that it is littered with instances where he makes claims that are not substantiated by evidence.  For example, Burns makes much of the case of another Connecticut State Trooper who he suspects is using steroids.  In his "Additional Material Facts" section, he asserts that "[t]here has been no action taken against [the trooper] despite his obvious use of steroids."  Pl.'s Additional Material Facts at ¶ 9.  In support of this statement, he cites to his Affidavit, which in turn cites to exhibits 53 and 54.[2]  Exhibits 53 and 54 consist of nothing more than two photographs of the trooper in question flexing his muscles.  Pl.'s Ex. 53 (Doc. No. 132-8); Pl.'s Ex. 54 (Doc. No. 132-8).  Yet Burns relies entirely on these two photos to conclude that the trooper was "obviously" using steroids, and then

---

[2] Plaintiff's citation to paragraph 107 of his Affidavit to support his allegations about the trooper appears to be an error.  Paragraph 107 concerns Burns' interactions with the union.  The relevant paragraphs in the Affidavit appear to be ¶¶ 103-06.  Aff. of Christopher Burns, Pl.'s Ex. 2 at ¶ 103-06.  Paragraph 105 of the Affidavit then cites to exhibits 53 and 54.  Id. at 105.

leverages that accusation against defendants to suggest that he was treated differently than a similarly situated officer who had not taken FMLA leave.[3]

In their Reply, defendants urge the court not to consider the plaintiff's Rule 56(a)2 Statement at all, due to these deficiencies.  Defs.' Reply at 2-5.  The court declines to go that far.  However, where plaintiff has failed to properly deny facts; has not provided specific citations to support his denials; cites to inadmissible evidence or evidence that does not support his claims; or presents facts that are extraneous and immaterial, the court deems defendants' facts admitted, or declines to consider the facts put forth by plaintiff.  The court applies this standard as it lays out the material facts below.

B.    Facts

The following facts are taken primarily from defendants' Local Rule 56(a)1 Statement of Facts, and, as discussed above, from plaintiff's Local Rule 56(a)2 Statement of Facts and Additional Material Facts section when appropriately supported by admissible evidence.

Plaintiff Burns has been a Connecticut State Police Trooper since June 2001. Second Am. Compl. at ¶ 13; Defs.' Answer and Affirmative Defenses at ¶ 13 ("Defs.' Answer") (Doc. No. 88).  In 2006, he became a Detective at the Eastern District Major Crimes Unit (EDMC), and on or about November 2014, he was assigned to Troop C

---

[3] Defendants have also objected to exhibits 53 and 54 on the grounds that plaintiff did not produce them during discovery and only emailed the photos to defendants' counsel after the close of the discovery period.  Defs.' Reply at 6 n. 5.

within the EDMC.  Second Am. Compl. at ¶ 14; Defs.' Answer at ¶ 14; Defs.' R. 56(a)1 Stmt at ¶ 16; Pl.'s R. 56(a)2 Stmt at ¶ 16.

Burns has a severely disabled child who requires special care.  Second Am. Compl. at ¶ 16.  Because his daughter was undergoing spinal surgery, Burns sought FMLA family-care leave to care for her.  Second Am. Compl. at ¶ 17.  Burns' request was approved, and he began taking leave on July 11, 2018.  Defs.' R. 56(a)1 Stmt at ¶ 21.  His leave was extended several times until October 8, 2018.[4]  Id.

On July 12, the day after he began taking leave, Sergeant Asselin, in consultation with Lieutenant DelGrosso, submitted a complaint to the DESPP Professional Standards Internal Affairs Unit ("Internal Affairs") concerning Burns.  Defs.' R. 56(a)1 Stmt at ¶ 35; Pl.'s R. 56(a)2 Stmt at ¶ 35.  They requested an investigation into Burns' "failure to submit required reports as well as his apparent failure to complete the necessary investigative steps to bring [certain cases] to any type of conclusion."  Id. (internal quotations omitted).

The Internal Affairs complaint related to plaintiff's performance in a series of cases dating back to 2017, in particular a serious child abuse case.[5]  Defs.' R. 56(a)1 Stmt at ¶ 36.  The parties dispute whether or not Burns' work in these cases warranted

---

[4] Burns purports to deny paragraph 21 in full.  See Pl.'s R. 56(a)2 Stmt at ¶ 21.  The statements he makes and exhibits he cites in his denial do not, however, relate to the extension of his leave, nor do they refute the fact that he began taking leave on July 11, 2018.  Id.

[5] Plaintiff again purports to deny that "Lt. DelGrosso testified in his deposition that the complaint to Internal Affairs was . . . because of lack of work and little activity in several cases dating back to 2017 and 2018, including the very serious child assault case."  Defs.' R. 56(a)1 Stmt at ¶ 36; Pl.'s R. 56(a)2 Stmt at ¶ 36.  Plaintiff's statements in denial provide additional detail about why the child abuse case stalled while Burns was investigating it, but do not contradict DelGrosso's testimony that the Internal Affairs complaint was related to Burns' performance in that and other cases.

7

the complaint.  Defendants point out that Sergeant Ruddy had filled out multiple

performance evaluations noting additional steps Burns had yet to complete in his

assigned cases; that Asselin had determined Burns had completed "minimal

investigative steps" in the child abuse case, instructed him to complete those steps, and

he never did; and that Asselin had identified three other cases where Burns was the

primary investigator and "had not completed the necessary investigative steps."  Defs.'

R. 56(a)1 Stmt at ¶¶ 24-25, 28, 32.  Burns, in turn, attacks the credentials of Ruddy and

Asselin and contends they were not well-positioned to evaluate his performance,

despite the undisputed fact that Asselin was his supervisor; provides additional context

for why the child abuse case had not progressed; points out the fact that Ruddy's

reports were not completed until early July, just before he took FMLA leave; and notes

that no other corrective actions were taken to notify him of the concerns with his work

performance and help him address the issue.[6]  Pl.'s R. 56(a)2 Stmt at ¶¶ 24-25, 28, 31-

32, 34, 36.

Around the same time Asselin submitted the Internal Affairs complaint, Burns

was also the subject of two criminal allegations levied against him, neither of which

resulted in any formal charges.  The first stemmed from a June 28, 2018 meeting that

Asselin and Ruddy attended with the wife of a deceased former municipal officer.[7]

---

[6] Burns also makes insinuations unsupported by evidence in the record regarding Asselin and
DelGrosso's motivations for making the complaint.  For instance, he states that Ruddy "was working on
the narrative with Delgrosso [sic] for their [Internal Affairs] complaint . . . filed the day after plaintiff's
daughter's surgery and while he was on FMLA."  Pl.'s R. 56(a)2 Stmt at ¶ 25.  In support of this claim, he
cites to pages 72-73 of his deposition testimony.  These pages in no way support the claim that Ruddy,
Asselin, and DelGrosso were collaborating in some way on a narrative regarding Burns' leave.  As such,
the court does not credit plaintiff's statement.

Defs.' R. 56(a)1 Stmt at ¶¶ 37-38; Pl.'s R. 56(a)2 Stmt at ¶ 38.  The investigation into

the former officer's death had determined he had died by suicide, and his wife

requested the meeting to inform Asselin and Ruddy that she believed Burns had been

providing her husband with illegal steroids.[8]  Defs.' R. 56(a)1 Stmt at ¶ 39.  After the

meeting, Asselin immediately notified DelGrosso, who notified his chain of command.[9]

Id. at ¶ 40.  Asselin also drafted a memorandum, dated June 28, 2018, summarizing the

meeting, and on July 13, 2018, two days after Burns began his FMLA leave, DelGrosso

submitted a second complaint to Internal Affairs, attaching Asselin's memorandum.[10]

Defs.' R. 56(a)1 Stmt at ¶¶ 42-43; Pl.'s R. 56(a)2 Stmt at ¶ 42.  Four days later, on July

17, defendant Mellekas assigned the complaint to Sergeant Alain Bisson for criminal

investigation.[11]  Defs.' R. 56(a)2 Stmt at ¶¶ 44, 45.

---

[7] Plaintiff purports to deny that the meeting occurred, but his two pages of statements in denial are not responsive to defendants' narrow assertion in paragraph 37 that the meeting took place.  See Pl.'s R. 56(a)2 Stmt at ¶ 37.

[8] Again, Burns attempts to deny what the wife told Asselin and Ruddy at the meeting, but does not cite to any evidence in the record to support his denial.  See Pl.'s R. 56(a)2 Stmt at ¶ 39.

[9] Burns does not adequately deny paragraph 40 either.  See Pl.'s R. 56(a)2 Stmt at ¶ 40; see also supra at 2-3 (discussing how plaintiff inappropriately used his denial of paragraph 40 to attempt to introduce certain material facts into the record).

[10] Plaintiff purports to deny the assertion that DelGrosso submitted the complaint, but in his denial also states that "on 7/13/18, LT DelGrosso submitted the IA complaint against Burns."

[11] Burns denies paragraph 44 by alleging that defendant Mellekas waited three weeks to assign the complaint to Bisson.  Pl.'s R. 56(a)2 Stmt at ¶ 44 (citing Burns' Affidavit).  Not only is this allegation conclusory and therefore insufficient to show the existence of a dispute of material fact, it is also contradicted by ample, uncontroverted evidence in the record showing that Bisson was assigned the case on July 17, 2018.  See Defs.' R. 56(a)1 Stmt at ¶ 44 (citing Bisson's deposition and his investigation report, both of which state he was assigned the case on July 17).  Defendants' paragraph 44 is therefore admitted.

He also denies paragraph 45 by alleging that "Bisson was personally assigned to investigate plaintiff by LTC Mellekas, and was tasked with conducting a biased and retaliatory investigation because plaintiff used FMLA."  Pl.'s R. 56(a)2 Stmt at ¶ 45.  He cites to pages 188-89 of Bisson's testimony to support this claim.  Id.  Bisson says nothing of the sort.

That same day, Asselin was approached by Detective Ronald Richardson, who informed him that in the process of returning items related to a 2016 untimely death investigation to the decedent's husband, he discovered that a Samsung smartphone belonging to the decedent was missing.  Defs.' R. 56(a)1 Stmt at ¶ 47; Pl.'s R. 56(a)2 Stmt at ¶ 47.  The phone in question had last been signed out by Burns two years earlier.  Id.  Richardson also informed Asselin that he had called Burns, who admitted he had the phone and told Richardson he would return it to the decedent's husband.  Defs.' R. 56(a)1 Stmt at ¶ 48; Pl.'s R. 56(a)2 Stmt at ¶ 48.  Asselin contacted DelGrosso and relayed what he had been told by Detective Richardson.  Defs.' R. 56(a)1 Stmt at ¶ 49.  DelGrosso told him to have an audit done of the evidence room related to any investigations in which Burns was listed as the primary investigator on and for which evidence was seized from January 1, 2016 through June 1, 2018.  Id. at ¶ 50.  DelGrosso testified that he ordered the audit to be completed to determine if the missing phone was an isolated incident or not.  Id. at ¶ 51.  Burns stated in his Affidavit that the audit was biased and that "the defendants went back over 5 years looking for any discrepancies which they could use against me."  Aff. of Christopher Burns, Pl.'s Ex. 2 at ¶ 71.

The parties agree, however, that on July 17, 2018, DelGrosso forwarded a third complaint to Internal Affairs based on this information.  Defs.' R. 56(a)1 Stmt at ¶ 52; Pl.'s R. 56(a)2 Stmt at ¶ 52.  On July 26, 2018, the audit was completed, revealing that there were two other cases investigated by Burns where there was missing evidence, including "an iPhone 6 [that] was signed out to the plaintiff in 2016 . . . [and] several pieces of evidence unaccounted for, including an Android phone" from another

investigation.[12]  Defs.' R. 56(a)1 Stmt at ¶ 54; Pl.'s R. 56(a)2 Stmt at ¶ 54.  The results

of the audit led Asselin to submit a supplemental complaint to Internal Affairs, and on

July 28, 2018, Bisson was assigned to investigate the missing items.  Defs.' R. 56(a)1

Stmt at ¶¶ 56, 58; Pl.'s R. 56(a)2 Stmt at ¶¶ 56, 58.

      In light of all this activity, Burns' police powers were administratively suspended

effective July 30, 2018, pursuant to Article 15, Section 6(b) of the Collective Bargaining

Agreement.[13]  Defs.' R. 56(a)1 Stmt at ¶ 59.  Article 15, Section 6(b) of the Collective

Bargaining Agreement provides that "the Commissioner . . . or his/her designee <u>may</u>

suspend an employee's police powers when the nature of the alleged offense in his/her

view warrants such action or where the employee's mental or physical fitness for duty is

in question.  An employee so suspended shall be assigned duties which do not require

the exercise of police powers."  Defs.' R. 56(a)1 Stmt at ¶ 60; Pl.'s R. 56(a)2 Stmt at ¶

60.  Defendant Battle, in consultation with defendant Mellekas, made the decision to

administratively suspend Burns.[14]  Defs.' R. 56(a)1 Stmt at ¶ 61.  Both testified that the

---

[12] Plaintiff again says he denies this paragraph, but at the same time admits that "two other cell phones were unaccounted for that plaintiff was assigned as investigator."  Pl.'s Rule 56(a)2 Stmt at ¶ 54.

[13] Plaintiff does not admit, deny, or address paragraph 59 in his Rule 56(a)2 Statement.  As such, it is admitted.  <u>See</u> D. Conn. L. Civ. R. 56(a)1 ("[e]ach material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted . . . unless such fact in controverted by the Local Rule 56(a)2 Statement").

[14] Plaintiff also attempts to deny the narrow fact put forth by plaintiff that defendant Battle, in consultation with defendant Mellekas, made the decision to administratively suspend Burns.  <u>See</u> Pl.'s R. 56(a)2 Stmt at ¶ 61.  He does so by making allegations unsubstantiated by the record that, for instance, "Mellekas ordered Bisson to manufacture a statement from [the wife] to arguably substantiate her blatantly incredible verbal statements to Ruddy and Asselin."  <u>Id.</u>  In support of this statement, he cites to pages 127-129 of Bisson's deposition.  Those pages do not substantiate plaintiff's allegations.  Because nothing in paragraph 61 of plaintiff's Rule 56(a)2 Statement contradicts defendants' fact that Battle, in consultation with Mellekas, made the decision to administratively suspend Burns, it is admitted.  <u>See</u> Pl.'s R. 56(a)2 Stmt at ¶ 61.

decision was "based on information as to [the] two criminal allegations against [Burns]." Id. Burns himself was not suspended; his police powers were administratively suspended pending the investigations.  Id. at ¶ 67; Pl.'s R. 56(a)2 Stmt at ¶ 67. Though the parties agree that the suspension of police powers is not considered "discipline" under the Collective Bargaining Agreement, plaintiff contends that "[t]he manner in which the [administrative] suspension was processed became discipline."  Defs.' R. 56(a)1 Stmt at ¶ 68; Pl.'s R. 56(a)2 Stmt at ¶ 68.

When Burns returned from FMLA family-care leave on October 9, 2018, he was assigned to the State Police Bureau of Identification Fingerprint Identification Unit ("Fingerprint Unit"), a position where he was not required to exercise his police powers. Defs.' R. 56(a)1 Stmt at ¶ 70.  Defendant Battle made the decision, in consultation with the Lieutenant Colonels, including defendant Mellekas, to assign him to the Fingerprint Unit.[15]  Id. at 71; Dep. of George Battle, Pl.'s Ex. 5 at 93-94.  Shortly after he returned to work in the Fingerprint Unit, Burns requested and was approved for FMLA leave for his own condition.  Defs.' R. 56(a)1 Stmt at ¶ 76; Pl.'s R. 56(a)2 Stmt at ¶ 76.  The medical certificate supporting his leave was dated February 25, 2019, and stated that he had "severe stress, anxiety, does not feel safe at work, [and is] fearful.  Due to these symptoms he is unable to work."  Id.  Burns has remained out of work since February 2019, pursuant to medical certificates stating that he has PTSD due to his work

---

[15] Burns contends that he "was assigned to the Fingerprint Unit to humiliate him.  A decision made to humiliate Burns."  Pl.'s R. 56(a)2 Stmt at ¶ 71.  The citations he makes to the record do not support this claim.  Id.

environment and is not able to work.  Defs.' R. 56(a)1 Stmt at ¶ 77; Pl.'s R. 56(a)2 Stmt at ¶ 77.

Since then, the first Internal Affairs complaint and the two criminal investigations against Burns have been brought to a close.  In March 2019, Sergeant Jack Kulig sustained several violations in the first complaint regarding Burns' handling of cases, concluding that he had failed to document multiple investigative steps in the four cases described in the complaint, failed to submit or collect evidence in those cases, and failed to perform his duties as a detective.  Defs.' R. 56(a)1 Stmt at ¶ 87; Pl.'s R. 56(a)2 Stmt at ¶ 87.  The criminal investigation regarding the missing cell phones concluded in July 2019.  Defs.' R. 56(a)1 Stmt at ¶ 91; Pl.'s R. 56 (a)2 Stmt at ¶ 91.  Bisson had applied for an arrest warrant against Burns for felony larceny based on his investigation, and when it was denied by the prosecutor due to chain of custody issues with respect to one of the cell phones, he closed the case.[16]  Defs.' R. 56(a)1 Stmt at ¶¶ 88, 90; Pl.'s R. 56(a)2 Stmt at ¶ 88.  The steroid investigation was also closed in August 2019, with no charges brought against Burns.[17]  Defs.' R. 56(a)1 Stmt at ¶¶ 92-93.

C.   Procedural History

Burns filed his initial Complaint on April 12, 2019.  See Compl. (Doc. No. 1).  On October 30, 2019, the court granted in part and denied in part the defendants' Motion to

---

[16] Plaintiff states that "[the prosecutor] also pointed out that one of the missing property items, a cell phone, was accounted for on another Detective's desk and that there were issue[s] with how evidence and property were handled at the EDMC."  Pl.'s R. 56(a)2 Stmt at ¶ 90.  His citations do not support this statement.

[17] Plaintiff contends that the investigation was unnecessarily kept open for over a year.  Pl.'s R. 56(a)2 Stmt at ¶¶ 92-93.  His only support for this claim is the conclusory allegation in his Affidavit.  Id.

13

Dismiss the initial Complaint.  See Oct. 2019 Ruling at 35-36.  The court's October 2019

Ruling permitted Burns to replead certain aspects of his initial Complaint, id., and Burns

responded by filing his First Amended Complaint on November 7, 2019, see Am.

Compl. (Doc. No. 49).

Subsequently, on February 21, 2020, the court granted in part and denied in part

the defendants' Motion to Dismiss the First Amended Complaint.  See Feb. 2020 Ruling

at 29-32.  As relevant here, the court's February 2020 Ruling (1) permitted Burns' FMLA

retaliation and interference claims, pursuant to the FMLA family-care provision, to

proceed against Schriro, Rovella, Battle, and Mellekas, in their individual capacities; (2)

dismissed all claims for punitive damages under the FMLA; (3) dismissed Burns'

claims for injunctive and declaratory relief, while granting Burns leave to "replead to specify the

injunctive relief he seeks under the FMLA, as to DESPP, Rovella, and Mellekas"; and

(4) dismissed Burns' constitutional claims, while granting Burns leave to "replead

allegations related to the post-deprivation process that was available to him and

whether he attempted to avail himself of that process," in connection with due process

claims "against Battle and Schriro only."  Id.

Burns filed his Second Amended Complaint, the operative pleading in this case,

on February 28, 2019.  See Second Am. Compl.  Count One of the Second Amended

Complaint asserts claims for interference with and retaliation against Burns' exercise of

his rights under the FMLA's family-care provisions, against DESPP, Rovella, Schriro,

Battle, and Mellekas.  Id. ¶¶ 89-99.  Count Two asserts claims for violations of Burns'

right to due process of law, under the Fourteenth Amendment, against Schriro and

Battle.  Id. ¶¶ 100-11.  On April 3, 2020, the defendants filed an Answer to the Second
Amended Complaint.  See Defs.' Answer.

Following discovery, the defendants filed a Motion for Summary Judgment, as to
all claims.  See Defs.' Mot. for Summ. J.  Burns filed his Opposition to the Motion, and
the defendants filed their Reply.  See Pl.'s Mem; Defs.' Reply.  As discussed above, the
parties also filed four other Motions relating to the defendants' Motion for Summary
Judgment, and the court issued an Order to Show Cause related to defendants' Reply.

## III.   MOTIONS TO SEAL, ORDER TO SHOW CAUSE, AND MOTION FOR LEAVE TO FILE EXCESS PAGES

As a threshold matter, the court addresses the four pending motions related to
the defendants' Motion for Summary Judgment, as well as its Order to Show Cause.

### A.   Motions to Seal and Order to Show Cause

First, the defendants have filed a Motion to Seal unredacted versions of their
Local Rule 56(a)1 Statement and certain accompanying exhibits.  See Mot. for
Permission to File Local R. 56(a)1 and Exs. Under Seal ("Defs.' First Mot. to Seal")
(Doc. No. 126).  Burns opposes this Motion in part, objecting to the defendants' request
to redact the names and other information regarding various individuals involved in "the
complaint that [led] to the criminal investigation and subsequent suspension of [the]
plaintiff."  See Pl.'s Obj. and Mem. in Opp'n to Defs.' Mot. to Seal at 2 ("Pl.'s Opp'n to
First Mot. to Seal") (Doc. No. 128).

Local Rule 5(e)3 provides that "[a]ny [ ] order sealing a judicial document shall
include particularized findings demonstrating that sealing is supported by clear and
compelling reasons and is narrowly tailored to serve those reasons."  D. Conn. L. Civ.

15

R. 5(e)3.  The Second Circuit has instructed that "documents submitted to a court for its consideration in a summary judgment motion are – as a matter of law – judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment."  Trump v. Deutsche Bank AG, 940 F.3d 146, 151 (2d Cir. 2019) (citation omitted).  However, the Second Circuit has also acknowledged, albeit in connection with a motion that did not seek summary judgment, that specific names of third-party individuals "are not necessarily relevant" to the resolution of a motion.  Id.  "The proper inquiry" to determine whether an order to seal is appropriate "is whether the documents are relevant to the performance of the judicial function."  Id. at 152 (internal citations and quotations omitted).

The court grants the first Motion to Seal.  The redactions of addresses and dates of birth are narrowly tailored and support the clear and compelling interest of protecting individuals' personal information and security.  The redactions of the names of individuals who were suspects in cases investigated by Burns, and of other DESPP employees who were the subject of Internal Affairs investigations, are narrowly tailored and support the clear and compelling interest of not disclosing sensitive, private information relating to uncharged misconduct of nonparties.  While the redactions of the names of other individuals is a closer call, the court concludes that these redactions are narrowly tailored and support the clear and compelling interest of protecting these individuals' privacy, because the individuals' specific names are not relevant to the court's resolution of the defendants' Motion for Summary Judgment.  The relevance of these individuals' roles and actions are clear from the context provided in the redacted documents, without disclosing their names.

16

Second, the defendants have filed a Motion to Seal unredacted versions of Exhibits 6 and 9 to their Rule 56(a)1 Statement.  <u>See</u> Mot. for Permission to Seal Exs. ("Defs.' Second Mot. to Seal") (Doc. No. 129).  Defendants filed this Motion shortly after their first Motion to Seal because they "inadvertently left out of their [initial] redactions identifying information of a third-party individual."  <u>Id.</u> at 1.  Plaintiff has not opposed this Motion.  For the same reasons stated above, the court also grants the second Motion to Seal.

Third, the defendants have filed a Motion to Seal unredacted versions of certain exhibits to their Reply.  <u>See</u> Mot. for Permission to File Exs. Under Seal ("Defs.' Third Mot. to Seal") (Doc. No. 135).  Again, defendants move to seal "identifying information, including the names of [third-party] individuals."  Plaintiff has not opposed this Motion, and, for the same reasons stated above, the court grants the third Motion to Seal.

Finally, in their Reply, defendants have asked the court to order the plaintiff to redact third-party names in his Rule 56(a)2 Statement, Memorandum of Law, and exhibits.  Defs.' Reply at 2 n. 2.  They have also asked the court to order the plaintiff to redact "names related to the child assault case involving the Department of Children and Families" in those same documents.  <u>Id.</u>  Because plaintiff had not had a formal opportunity to respond to this request, the court ordered plaintiff to show cause as to why the request should not be granted.  Order to Show Cause (Doc. No. 138).  Plaintiff, in his response, agreed that this information should be sealed and filed redacted versions of those documents on the record. Pl.'s Resp. to Order to Show Cause (Doc. No. 139).  Accordingly, the court orders the unredacted copies of these documents sealed.

17

B.      Motion for Leave to File Excess Pages

In addition, defendants have filed a Motion for Leave to file a reply that exceeds the ten-page limit normally required by Local Rule 7(d).  See Mot. for Excess Pages. They argue that additional space was necessary to address all the issues raised by the plaintiff in his opposition brief and 89-page Rule 56(a)2 Statement.  Id. at 1.  Burns opposes this Motion.  See Pl.'s Mem. in Opp'n to M. for Leave to File Excess Pages.

As discussed above in Section II.A, plaintiff's Rule 56(a)2 Statement included serious deficiencies.  Given these deficiencies, and the fact that plaintiff's Local Rule 56(a)2 Statement itself exceeded the page limit and was filed without leave of court, the court concludes that permitting defendants to file additional pages in their Reply is appropriate in these circumstances.  The defendants' Motion for Leave to File Excess Pages is therefore granted nunc pro tunc.

IV.    MOTION FOR SUMMARY JUDGMENT

A.      Standard of Review

A motion for summary judgment will be granted if the record shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact.  Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986).  The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A genuine issue of material fact exists where the evidence is such that a reasonable jury could decide in

18

the non-moving party's favor.  See, e.g., Biondo v. Kaledia Health, 935 F.3d 68, 73 (2d

Cir. 2019) (citing Anderson, 477 U.S. at 248)).

      B.    Discussion

         1.    FMLA

In Count One, Burns alleges claims against defendants DESPP, Rovella, Schriro,

Battle, and Mellekas for interference and retaliation under the FMLA family-care

provision.

The FMLA entitles eligible employees to take up to twelve weeks of leave during

any twelve-month period.  29 U.S.C. § 2612(a)(1).  Employees may only take FMLA

leave for statutorily specified reasons, which include "car[ing] for the . . . daughter . . . of

the employee, if such [daughter] . . . has a serious health condition."  Id. §

2612(a)(1)(C).  Additionally, "[a]n employee has the right to return to the position she

held before taking leave, or to an 'equivalent position with equivalent employment

benefits, pay, and other terms and conditions of employment.'"  Woods v. START

Treatment & Recovery Ctrs., Inc., 864 F.3d 158, 166 (2d Cir. 2017) (quoting 29 U.S.C. §

2614(a)(1)(B)).  As an enforcement mechanism for these statutory rights, the FMLA

"'creates a private right of action to seek both equitable relief and money damages

against any employer . . . should that employer interfere with, restrain, or deny the

exercise of FMLA rights."  Id. (quoting Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 174

(2d Cir. 2006)).

The Second Circuit has recognized that "FMLA claims come in at least two

varieties: interference and retaliation."  Id. (citing Potenza v. City of New York, 365 F.3d

165, 167 (2d Cir. 2004)).  An interference claim arises "when [an] employer has

prevented or otherwise impeded [an] employee's ability to exercise rights under the FMLA." Id. (citing Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 424 (2d Cir. 2016)). A retaliation claim arises when "an employee actually exercis[es] her rights or oppos[es] perceived unlawful conduct under the FMLA and then [is] subjected to some adverse employment action by the employer." Id. (citing Potenza, 365 F.3d at 168). Together, interference claims and retaliation claims "serve as ex ante and ex post protections for employees who seek to avail themselves of rights granted by the FMLA." Id.

### a.   Schriro and Rovella as Employers

In order to be personally liable under the FMLA, an individual must be an "employer" as defined by the statute. See Oct. 2019 Ruling at 22. Defendants argue that, because Schriro and Rovella do not meet this definition, they are entitled to judgment as a matter of law as to plaintiff's FMLA claims against them. Defs.' Mem. at 6.

"The definition of 'employer' under the FMLA includes 'any public agency' and encompasses any person who 'acts, directly or indirectly, in the interest of an employer to any of the employees of such employer'." Oct. 2019 Ruling at 22 (quoting 29 U.S.C. § 2611(4)(a)). Public employees can qualify as employers under the FMLA. Id. ("this court agrees with the district courts in this Circuit that have concluded that public employees can qualify as 'employers' under the FMLA").

To determine if a particular individual qualifies as an employer under the FMLA, "courts in the Second Circuit apply the 'economic reality test'." Feb. 2020 Ruling at 6 (citing Graziadio, 817 F.3d at 422). "Under that test, courts must consider a 'nonexclusive and overlapping set of factors,' including 'whether the alleged employer

20

(1) had the power to hire and fire the employee, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'"  Oct. 2019 Ruling at 23 (citing Graziadio, 817 F.3d at 422).  "No one of the four factors alone is dispositive."  Id. at 23. Rather, in making this assessment, "[t]he ultimate question is, considering the totality of the circumstances, 'whether the putative employer controlled in whole or in part [the] plaintiff's rights under the FMLA'."  Feb. 2020 Ruling at 6 (quoting Graziadio, 817 F.3d at 422-23).

In the October 2019 Ruling, this court dismissed the FMLA family-care claims against Schriro and Rovella in the initial Complaint because the allegations by the plaintiff "[did] not suffice to support a reasonable inference that . . . Schriro [or] Rovella . . . had any control over Burns' rights under the FMLA, such that they could fire him, supervise his work or schedule, determine his pay, or maintain records."  Oct. 2019 Ruling at 24.  The allegations against Schriro and Rovella in the initial Complaint were limited to describing them as "policymakers of the DESPP", who "ratified and promoted the . . . violations" against Burns.  Id.  "Simply because an individual is a policymaker," this court reasoned, "does not suggest that that person has any control, in whole or in part, over Burns' ability to exercise his rights under the FMLA."  Id. at 25.

In the February 2020 Ruling, however, this court denied defendants' Motion to Dismiss the FMLA family-care claims against Schriro and Rovella as to the argument that they were not employers for the purposes of the FMLA.  Feb. 2020 Ruling at 5-8. In his Amended Complaint, Burns had alleged that Schriro had "suspended, demoted, and transferred" Burns, and that Rovella had "delayed approval" of his Union Sick

Leave Bank ("SLB") requests.  Id. at 6.  "Reading the Amended Complaint in the light most favorable to Burns", this court found that his allegations "support[ed] a plausible inference" that Schriro and Rovella were directly involved in the actions taken against Burns and were therefore his "employers" for the purposes of the FMLA.  Id. at 8.

At this stage, however, Burns has not presented evidence from which a reasonable jury could conclude that Schriro is an employer for the purposes of FMLA. In interpreting Graziado and the "economic reality" test in the context of FMLA claims made against supervisors, district courts have looked to the degree of the supervisor's personal involvement to determine whether they were employers.  See, e.g. Santiago v. Dep't of Transp., 50 F.Supp. 3d 136, 151 (D. Conn. 2014) (dismissing a claim against "the highest ranking official within the [agency who] had authority over personnel decisions" because "there [was] no evidence in the record that he actually exercised any of [that] authority in relation to [plaintiff's] FMLA rights such that he could be held personally liable for violations"); Noia v. Orthopedic Associates of Long Island, 93 F.Supp.3d 13, 17 (E.D.N.Y. 2015) (noting that "the [p]laintiff [had] fail[ed] to allege direct involvement by [the defendant] in the alleged FMLA violation" and that "[t]his is fatal to the [p]laintiff's proposed FMLA claim").  "Beyond . . . job title[s] and responsibilities", courts have held that a plaintiff must "present [ ] evidence that [the defendant] was generally involved in such decisionmaking."  Ferrara v. Maturo, No. 3:17-CV-0360, 2019 WL 4038738 at *12 (D. Conn. Aug. 26, 2019).  In other words, even if the defendant "may have had the potential to exercise sufficient authority to be an 'employer' within the meaning of the FMLA", such a defendant must actually "control[ ] in whole or in part

22

[the] plaintiff's rights under the FMLA."  Feb. 2020 Ruling at 6 (quoting <u>Graziadio</u>, 817 F.3d at 422-23) (emphasis added).

Here, there is no evidence in the record to suggest that Schriro was involved in any of the administrative actions taken against Burns.  Plaintiff makes much of the fact that Article 15, Section 6(b) of the Collective Bargaining Agreement provides that "the Commissioner . . . <u>or his/her designee</u> may suspend an employee's police powers" to argue that, even if Schriro was not personally involved in the decision to suspend Burns' police powers, the fact that she "had the ultimate authority" to do so is sufficient to establish her as an employer for the purposes of FMLA liability.  Defs.' R. 56(a)1 Stmt at ¶ 60; Pl.'s R. 56(a)2 Stmt at ¶ 60 (emphasis added); Pl.'s Mem. at 8.  Plaintiff also points out that, in her Affidavit, Schriro stated that Battle "served as [her] designee and had the authority to administratively suspend [Burns'] police powers", and that Battle notified Schriro of his decision to suspend Burns' police powers.  Aff. of Dora Schriro, Defs.' Ex. 2 at ¶ 11; Dep. of George Battle, Pl.'s Ex. 5 at 42.

Yet these facts fall short of the allegations made in the Second Amended Complaint.  There, Burns alleged that Schriro initiated the two criminal investigations against Burns and the Internal Affairs complaint regarding Burns' work product, and after initiating these "false and dubious investigations . . . ordered that [his] police powers, badge, weapons, and car [be] taken from him."  Second Am. Compl. at ¶¶ 22, 24, 29, 34, 93.  Indeed, there is no indication from the record that Schriro had any direct involvement in "suspend[ing], demot[ing], or transferr[ing] Burns," such that she could fire him, supervise his work or schedule, determine his pay, or maintain records.  <u>Id.</u> at ¶ 94.  Nor has plaintiff "presented any evidence that [Schriro] was generally involved in

23

such decisionmaking, such that a jury might reasonabl[y] infer [her] involvement in the [alleged] conduct." <u>Ferrara</u>, 2019 WL 4038738 at *12.  As such, plaintiff has failed to demonstrate the existence of a genuine issue of fact as to Schriro's status as an "employer" under the FMLA.

In Rovella's case, however, there is some evidence upon which a reasonable jury could determine he was an employer for the purposes of the FMLA.  Burns has, to be sure, failed to provide evidence upon which a reasonable jury could conclude that "Commissioner Rovella . . . held up approval" of his SLB request.[18]  But there is evidence in the record that Rovella personally denied Burns' request for paid administrative leave in a letter dated December 2, 2019.  Letter from Rovella to Burns, Pl.'s Ex. 14.  Although defendants are correct to point out that there is no evidence in the record upon which a reasonable jury could conclude that "Rovella [was] aware of the status of the investigations involving the plaintiff other than that the Internal Affairs process has not yet been concluded", and that there is no evidence in the record demonstrating that Rovella was involved in decisions pertaining to Burns' police powers, his personal involvement in denying Burns' request for paid administrative leave creates

_____

[18] The court notes that, in its February 2020 Ruling, it relied largely on Burns' allegation that Rovella had himself delayed approval of Burns' SLB request to conclude that "Rovella's involvement in determining which employees received SLB sick days supports a reasonable inference that he had the ability to control, in whole or in part, Burns' employment and his access to his FMLA benefits."  Feb. 2020 Ruling at 8.  Burns, however, removed these allegations from his Second Amended Complaint.  <u>See</u> Second Am. Compl.

In the "Additional Material Facts" section of his Local Rule 56(a)2 Statement, however, Burns attempts to resurrect them.  He asserts as fact that "[p]laintiff was delayed in receiving [SLB] wages when Commissioner Rovella . . . held up approval."  Pl.'s Additional Material Facts at ¶ 4.  But nothing in the record supports these allegations.  He cites only to his own conclusory statements in his Affidavit, as well as an email chain regarding his SLB application that does not include Commissioner Rovella or even mention him. <u>Id.</u>

a disputed issue of material fact as to Rovella's status as Burns' "employer" under

FMLA.  Defs.' Mem. at 6.

Because it would not be wholly unreasonable for a jury to conclude that Rovella

had, in denying Burns request, exercised control over the conditions of his employment

or made determinations related to his pay, the court does not grant defendants' Motion

for Summary Judgment based on their argument that the FMLA claims against Rovella

should be dismissed because he is not an "employer" for the purposes of the FMLA.

For the reasons stated above, it does, however, grant the Motion for Summary

Judgment as to plaintiff's FMLA claims against defendant Schriro.

> b.   Retaliation Claim Against the DESPP, Rovella, Battle, and
>      Mellekas

In assessing Burns' FMLA family-care retaliation claim against the DESPP,

Rovella, Battle, and Mellekas, the court applies the McDonnell Douglas burden-shifting

framework.  Mancini v. Accredo Health Grp., Inc., 411 F. Supp. 3d 243, 256 (D. Conn.

2019) (citing Roberts v. Health Ass'n, 308 F. App'x 568, 570 (2d Cir. 2009)).  In order to

make a prima facie showing of FMLA retaliation, a plaintiff must demonstrate the

following: "(1) she exercised her rights protected under the FMLA, (2) she was qualified

for her position, (3) she suffered an adverse employment action, and (4) the adverse

employment action occurred under circumstances giving rise to an inference of

retaliatory intent."  Roberts, 308 F. App'x at 570 (citing Potenza v. City of New York, 365

F.3d 165, 168 (2d Cir. 2004).  A plaintiff's burden for the purposes of satisfying the

elements of a prima facie retaliation claim "is not onerous."  Mancini, 411 F. Supp. 3d at

256 (quoting Ben-Levy v. Bloomberg, L.P., 518 F. App'x 17, 19 (2d Cir. 2013)).

25

If a plaintiff produces sufficient evidence for a prima facie showing, then "the burden shifts to [the defendant] to proffer a legitimate, nondiscriminatory reason for the adverse employment action."  Mancini, 411 F. Supp. 3d at 256.  If the defendant provides such a reason, then "the presumption of discrimination . . . drops from the picture" and the burden shifts back to the plaintiff to "demonstrate that [the defendant's] reason was pretext for retaliation for requesting FMLA."  Ben-Levy, 518 F. App'x at 19; Mancini, 411 F. Supp. 3d at 256.

Here, even assuming that Burns has established a prima facie retaliation claim, granting summary judgment is appropriate because defendants have proffered legitimate, nondiscriminatory reasons for the actions taken against Burns, and he has failed to come forward with any evidence demonstrating that those reasons were mere pretext.  Indeed, despite plaintiff's arguments to the contrary, there is nothing in the actual record from which a reasonable jury could conclude that defendants acted with discriminatory or retaliatory intent.  See section II.A, II.B, supra.

Lacking such evidence, Burns emphasizes the timing of the actions taken against him.  Pl.'s Mem. at 5. However, while "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation . . . such temporal proximity is [without more] insufficient to satisfy [Burns'] burden to bring forward some evidence of pretext."  El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010); see also Davies v. New York City Dept. of Educ., 563 F. App'x 818, 820-21 (2d Cir. 2014) ("[w]e have been clear that temporal proximity between protected activity and an adverse employment action, alone, is insufficient to establish pretext").

Burns also spends much of his brief and Local Rule 56(a)2 Statement disputing the legitimacy of the Internal Affairs complaints and criminal investigations conducted against him.  Yet, to establish pretext, he must do more than "challenge[ ] the substance" of the events that led to those complaints and investigations: "he [must] offer evidence from which a reasonable jury could conclude that [the] reasons [defendants have provided for taking these actions] were 'mere pretext'."  Ben-Levy, 518 F. App'x at 19; see also Lu v. Chase Inv. Servs. Corp., 412 F. App'x 413, 417 (2d Cir. 2011) (noting that simply showing that an employer's decision "may have been erroneous does not, without evidence that it was a pretext for discrimination, satisfy [the] burden under McDonnell Douglas").  Burns has not done so, nor has he provided other evidence beyond temporal proximity, upon which a reasonable jury could find that the reasons proffered by defendants for taking certain actions against Burns were pretextual.

Accordingly, defendants' Motion for Summary Judgment is granted as to Burn's FMLA family-care claim against the DESPP, Rovella, Battle, and Mellekas.

c.   <u>Interference Claim Against the DESPP, Rovella, Battle, and Mellekas</u>

To establish a FMLA interference claim under the family-care provision, the plaintiff must show "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA."  Oct. 2019 Ruling at 29 (quoting Graziadio, 817 F.3d at 424).  "[I]nterfering with the exercise of an employee's rights could include not only refusing to authorize leave, but

27

discouraging an employee from taking leave."  Oct. 2019 Ruling at 29 (citing <u>Potenza</u>,

365 F.3d at 167).  However, "[t]he result of the impermissible interference must be that

the employer denies the employee benefits under the FMLA."  Oct. 2019 Ruling at 29

(quoting <u>Dighello v. Thurston Foods, Inc.</u>, 307 F. Supp. 3d 5, 22 (D. Conn. 2018).

       Defendants argue that their Motion for Summary Judgment should be granted as

to Burns' interference claims because he has not demonstrated that he was denied any

benefits he was entitled to under the FMLA.  Defs.' Mem. at 17-19.  In his

Memorandum, Burns only addresses his interference claim briefly, saying that his

"assignment in the Fingerprint unit while on FMLA was intended to interfere with his

taking the leave."  Pl.'s Mem. at 15.  He argues that, because the suspension of his

police powers was "illegitimate", then "the reassignment was as well."  <u>Id.</u>

       In its February 2020 Ruling, this court noted that one of the benefits of the FMLA

is that "an employer must restore an employee who takes FMLA leave to the position he

held before the leave or to an equivalent position with equivalent employment benefits,

pay, and other terms and conditions of employment."  Oct. 2019 Ruling at 29 (internal

quotations and citations omitted).  The court then allowed Burns' claim against the

DESPP to proceed because it found that his allegation that he "was demoted and

transferred to the Bureau of Identification and that he ha[d] been denied overtime and

active duty assignments" to be sufficient to "support[ ] an inference that Burns' new role

is not an equivalent position to the one he occupied before he took FMLA leave."  Oct.

2019 Ruling at 29-30.

       The parties dispute whether or not Burns' assignment to the Fingerprint Unit

during the period in which his police powers were suspended constituted a "demotion",

28

but even assuming that it was, the "FMLA is not a shield to protect employees from legitimate disciplinary action by their employers." Greenberg v. State University Hospital – Downstate Medical Center, 838 F. App'x 603, 607 (2d Cir. 2020) (internal quotations and citations omitted). As discussed above, Burns has not brought forth evidence to show that his assignment to the Fingerprint Unit was in any way related to his decision to exercise his rights under the FMLA. Nor has he demonstrated that he was otherwise denied benefits he was entitled to under the statute.

Accordingly, the Motion for Summary Judgment is granted as to Burns' FMLA family-care interference claim against the DESPP, Rovella, Battle, and Mellekas.

2. Due Process

a. Personal Involvement of Schriro

The defendants argue that Burns has failed to come forward with evidence upon which a reasonable jury could find that Schriro was personally involved in the events underlying Burns' due process claim. See Def.'s Mem. at 19-20. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013) (citation omitted). In Colon v. Coughlin, 58 F.3d 855 (2d Cir. 1995), the Second Circuit held that "[t]he personal involvement of a supervisory defendant may be shown" through any of five routes, including evidence that "the defendant created a policy or custom under which constitutional practices occurred" or that "the defendant was grossly negligent in supervising subordinates who committed the wrongful acts." Id. at 873.

29

Recently, however, the Second Circuit determined that, "after [Ashcroft v.] Iqbal, [556 U.S. 662 (2009)], there is no special role for supervisory liability." Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020). "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" Id. (quoting Iqbal, 556 U.S. at 676). Thus, although "[t]he factors necessary to establish a [section] 1983 violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary[, t]he violation must be established against the supervisory official directly." Id. (citation, brackets, and quotation marks omitted). In addition, the court notes that, even under the Colon approach, "[t]he bare fact that [a defendant-official] occupies a high position in the [relevant government agency] hierarchy" was considered "insufficient to sustain [a] claim." Colon, 58 F.3d at 874 (citations omitted).

In Tangreti, the Second Circuit determined that the plaintiff failed to present sufficient evidence in support of a claim against a supervisory prison official for failure to prevent harm, because "the pretrial record does not permit the inference that [the defendant-official] had subjective knowledge of the risks of the sexual abuse inflicted on [the plaintiff]." Tangreti, 983 F.3d at 619. An essential element of the plaintiff's claim in that case was "that the defendant acted with deliberate indifference", which requires a showing that "the official [was] both aware of facts from which the inference can be drawn that a substantial risk of serious harm exist[ed], and . . .also dr[e]w the inference." Id. at 618-19 (citations and quotation marks omitted).

Here, in order for Burns to avoid summary judgment on his due process claim against Schriro, he must come forward with evidence to create a dispute of material fact

30

as to whether Schriro deprived him of his position in the Major Crimes Unit without affording Burns adequate procedural protections.  See Feb. 2020 Ruling at 15-24; O'Connor v. Pierson, 426 F.3d 187, 196 (2d Cir. 2005).  Burns argues that Schriro had the "authority to take the actions taken against [him]."  See Pl.'s Mem. at 28.  He notes that a memorandum concerning Connecticut's statewide FMLA policy was addressed to "Agency Heads and Human Resources Administrators", which would include Schriro. Ex. 11, Pl.'s R. 56(a)2 Stmt (Doc. No. 132-4 at 1-22) at 2; see Pl.'s Mem. at 28.  He also relies on Article 15 Section 6(b) of the CBA, which states that, "[i]n lieu of suspension with pay, the Commissioner . . . or his/her designee may suspend an employee's police powers."  Pl. R. 56(a)2 Stmt ¶ 60; see Pl.'s Mem. at 28.  Burns asserts that, "[i]nasmuch as Schriro 'designated' Battle to suspend Burns, she had personal involvement."  See Pl.'s Mem. at 28.

However, Burns identifies absolutely no evidence upon which a reasonable jury could find that Schriro took any action or made any decision specific to Burns.  His arguments amount to little more than "[t]he bare fact that" Schriro "occupies a high position in the [DESPP] hierarchy."  See Colon, 58 F.3d at 874.  Therefore, Burns has not provided evidence upon which a reasonable jury could conclude that Schriro, "through [her] own individual actions," deprived Burns of his position in the Major Crimes Unit.  See Tangreti, 983 F.3d at 618.  Accordingly, the court grants the defendants' Motion for Summary Judgment, as to the due process claim against Schriro, because Burns has not put forth evidence upon which a reasonable jury could conclude that Schriro was personally involved in the events underlying Burns' due process claim.

b.      Due Process Claim Against Battle

31

In assessing a property-based procedural due process claim under the Fourteenth Amendment, a court "[f]irst [ ] must determine whether some source of law other than the Constitution, such as a state or federal statute, confers a property right on the plaintiff." O'Connor v. Pierson, 426 F.3d 187, 196 (2d Cir. 2008). Further, "[w]hile state law defines the underlying substantive interest, 'federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause.'" Ezekwo v. N.Y. City Health & Hosps. Corp., 940 F.2d 775, 783 (2d Cir. 1991) (quoting Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9 (1978)).

In other words, the court must assess both (1) whether a source of state law, such as a public employment contract, gives rise to a property interest, and (2) whether such a property interest, if it exists, is significant enough to trigger constitutional protections. See id. With respect to the former inquiry, either written contractual provisions or "[a]dditional contractual provisions . . . 'implied' into a contract as a result of a course of dealing between the parties" can suffice. Id. As for whether a property interest possesses sufficient significance to trigger constitutional protections, "a court must look to whether the interest involved would be protected under state law and must weigh the importance to the holder of the right." Id. at 783 (citation and quotation marks omitted).

As the court noted in its February 2020 Ruling, "the Supreme Court and Second Circuit have recognized a variety of property rights related to employment," Feb. 2020 Ruling at 16, including "when an employee is demoted to a lower rank with lower pay," id. (citing Ciambrello v. County of Nassau, 292 F.3d 307, 318 (2d Cir. 2002)), and, in

32

certain situations, "a higher position 'of significant professional value.'"  Id. (quoting

Ezekwo, 940 F.2d at 783.  In permitting Burns' due process claim to proceed, the

court's February 2020 Ruling considered Burns' allegations that an "[a]ssignment to the

Major Crimes Unit is considered a prestigious assignment within the Connecticut State

Police"; that "Burns could no longer obtain extra duty or overtime work", thereby

"categorically los[ing] the ability to see a once 'regular' source of income"; and that "the

transfer resulted in Burns having a longer commute to and from work and increased

difficulty caring for his child."  Id. at 16-17 (citing Am. Compl. ¶¶ 38, 77, 79-82).  The

Prior Ruling also determined that Burns' allegations regarding reassurances he received

from his supervisors were sufficient "to support a plausible claim that there was a

'mutually explicit understanding[ ] that support[s] his claim of entitlement' to his position

in the Major Crimes Unit."  Id. at 18 n. 9 (quoting Perry v. Sindermann, 408 U.S. 593,

601 (1972)).

In support of their Motion for Summary Judgment, the defendants rely on Article

15 Section 6(b) of the CBA, which provides:

> In lieu of a suspension with pay, the Commissioner . . . or his/her designee
> may suspend an employee's police powers when the nature of the alleged
> offense in his/her view warrants such action or where the employee's
> mental or physical fitness for duty is in question.  An employee so
> suspended shall be assigned duties which do not require the exercise of
> police powers.

Defs.' R. 56(a)1 Stmt at ¶ 60; Pl.'s R. 56(a)2 Stmt at ¶ 60.  The defendants emphasize

that, in Gugliotti v. Miron, No. 3:08-CV-442, 2010 WL 3025223 (D. Conn. July 30, 2010),

the court determined that, on account of similar language in a different CBA, the plaintiff

police officer could not demonstrate a constitutionally protected property interest in connection with his suspension without pay.  See id. at *5-9.

The Gugliotti decision, however, expressly limited its holding to situations where an employee's claim is based on an asserted interest "merely to perform his job duties." Id. at *9.  Here, by contrast, and as noted in the court's February 2020 Ruling, Burns makes arguments relating to prestige, pay, and the impact of his commute on his ability to care for his daughter, whose serious medical condition is at the core of this case. See Feb. 2020 Ruling at 16-17.

In regard to the prestige associated with working in the Major Crimes Unit, Burns testified at his deposition that he was required to take a test in order to become eligible to join the Major Crimes Unit.  Burns Dep. at 23:19-20.  Burns also testified that members of the Major Crimes Unit were each given an unmarked car and were permitted flexibility in organizing their schedules.  Id. at 58:1-3.  In addition, Burns recounted that, "[o]ftentimes patrol troopers [in other units] will come to you and ask your direction on cases."  Id. at 58:5-7.  The court also notes that, as a matter of plain English, the label "Major Crimes Unit" connotes a high degree of responsibility for addressing serious or difficult offenses, as compared with the label "Fingerprint Unit." Indeed, the gravamen of the defendants' arguments on the issue of whether, in connection with Burns' FMLA claims, non-retaliatory reasons existed for the suspension of Burns' police powers, is that Burns was not fulfilling his duties "as primary investigator" for important matters, "including a very serious child assault case."  See Defs.' Mem. at 9.

With respect to overtime, the defendants contend that supervisor approval was required for overtime, overtime was in fact available to Burns during his assignment to the Fingerprint Unit, and Burns was never denied overtime when he was working in the Fingerprint Unit.  Defs.' Mem. at 22.  However, Burns testified that, on account of the suspension of his police powers, he was no longer able to perform the types of overtime work that he engaged in previously, such as highway construction patrol and being called out to crime scenes, and that "[t]he only people allowed to work overtime [in the Fingerprint Unit] were the fingerprint techs."  Burns Dep. at 187:17-188:8.  Further, Battle acknowledged during his deposition that the amount of overtime available to a member of DESPP varies "[d]epending on their assignment."  Battle Dep. at 143:19-21.  Although the Second Circuit has held that a mere "conclusory assertion that . . . alleged economic loss 'includ[ed] the predictable loss of overtime pay'" is insufficient to support a procedural due process claim, see Rolon v. Henneman, 517 F.3d 140, 148 (2d Cir. 2008), the deposition testimony in the current case is sufficient to support a finding by a reasonable jury that Burns was categorically denied types of overtime work that he regularly performed in the past, and that he had little or no opportunity to complete overtime work in the Fingerprint Unit.

As for Burn's increased travel to and from work, an "increased commute" that causes "more than a trivial hardship" properly informs a court's consideration of whether a plaintiff has identified a constitutionally cognizable property interest.  See Maglietti v. Nicholson, 517 F. Supp. 2d 624, 636 (D. Conn. 2007).  Burns stated in his Affidavit that

the Fingerprint Unit was "over 45 minutes away from [his] home", as compared with the

Major Crimes Unit, which was only "5 minutes away."[19]  Burns. Aff. ¶¶ 79-80, 82, 85.

However, Burns' only evidence in support of a "mutually explicit

understanding[ ]", Ezekwo, 940 F.2d at 782 (citation omitted), that could imply a

contractual provision giving rise to a property interest in maintaining an assignment to

the Major Crimes Unit during a suspension of police powers is a vague, unspecific

assertion in Burns' own Affidavit.  According to Burns, he was "told by [his] superiors

that [he] would not be removed from [his] position."[20]  Burns Aff. ¶ 9.  He does not say

who told him this or assert that it was a defendant in this case.  Nor does he aver that

the "superiors" who told him this had the authority to make such a promise.  As the

Second Circuit has explained, such vague and unspecific statements – "even if [they]

were not hearsay – [fail] to comply with Rule 56(e)."  Patterson v. County of Oneida,

N.Y., 375 F.3d 206, 223 (2d Cir. 2004).  When "no 'specific facts' as required by Rule

---

[19] Burns also argues that, "[s]ince January 2020 Defendants have notified plaintiff that he is responsible to pay for his health insurance coverage."  See Pl.'s Mem. at 19.  However, the portion of Manente's deposition on which Burns relies for this argument reflects that Burns has been required at all relevant times to pay his personal share of his health insurance premium.  See Manente Dep. at 179:12-24.  Previously, Burns' employee contribution for his health insurance premium was deducted from his paycheck; when he went on unpaid leave, he still needed to pay for this same employee contribution. See id.

[20] Although Burns cites to other portions of his Local Rule 56(a)2 Statement in the section of his Opposition that addresses whether Burns and his superiors shared a mutually explicit understanding concerning the nature of his assignment to the Major Crimes Unit, none of these other citations support Burns' argument on this issue.  See Pl.'s Mem. at 18-19.  For example, on page 19 of his Opposition, Burns states that "[t]roopers assigned to the Major Crimes Unit are not returned to patrol units."  Id. at 19. Burns cites to Paragraph 15 of his Local Rule 56(a)2 Statement in support of this proposition.  Id. Paragraph 15, in turn, contains several quotations from and citations to Burns' deposition testimony and Affidavit.  See Pl.'s R. 56(a)2 Stmt ¶ 15.  None of the excerpts from Burns' deposition testimony identified in Paragraph 15 addresses whether troopers assigned to the Major Crimes Unit are returned to patrol units.  See id. (citing Burns Dep. at 6, 57-61, 183).  The citation to Burns' Affidavit leads to the same vague, conclusory assertion discussed above.  See Pl.'s R. 56(a)2 Stmt ¶ 15.

56(e) [are] provided" by the party opposing summary judgment, a court can properly conclude that the party's "opposition to summary judgment [was not] properly supported." Id.

Moreover, "the party opposing summary judgment 'cannot rely on inadmissible hearsay in opposing a motion for summary judgment[ ] absent a showing that admissible evidence will be available at trial.'" Selvam v. Experian Info Sols., Inc., 651 F. App'x 29, 32 (2d Cir. 2016) (summary order) (quoting Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985)) (emphasis added in Selvam). And, in addition to being vague and unspecific, Burns' statement in his Affidavit concerning what his supervisors told him is hearsay – he offers this statement in order to prove a mutually explicit understanding sufficient to imply the existence of an unwritten contract provision that protected him from any type or degree of removal from his assignment to the Major Crimes Unit. See Pl.'s Mem. at 18 ("Plaintiff was assured that his position as a detective at EDMC was permanent and that he would not be removed."). Of course, simply because a statement is self-serving does not make it inadmissible. See Packer v. Raging Capital Management, LLC, 981 F.3d 148, 157 (2d Cir. 2020). But Burns does not meet the standard for admitting an opposing party's statement because he does not say he was promised he would not lose his position by Battle or another one of the individual parties to this case, nor does he identify the person or persons who made the statement or claim that they were authorized to make such a promise. See Fed. R. Evid. 801(d)(2). As such, Burns has not presented facts with the requisite specificity to meet the requirements of Rule 56(e), nor has he shown that admissible evidence would be available at trial on the issue of

whether the defendants made statements that could support a finding of a mutually explicit understanding.  Therefore, the court concludes on the record before it that Burns has failed to provide evidence upon which a reasonable jury could conclude that he possessed a constitutionally protected property interest in his assignment to the Major Crimes Unit.  The court grants the defendants' Motion for Summary Judgment as to Burns' due process claim against Battle.[21]

## V.    CONCLUSION

For the reasons stated above, the court grants the defendants' Motion for Summary Judgment.  It also grants their Motions to Seal, their Motion for Leave to File Excess Pages nunc pro tunc, and seals the unredacted versions of plaintiff's Rule 56(a)2 Statement, Memorandum of Law, and Exhibits.

**SO ORDERED.**

Dated this 20th day of September, 2021, at New Haven, Connecticut.


/s/ Janet C. Hall
Janet C. Hall
U.S. District Judge

---

[21] This ground for granting summary judgment also applies to the due process claim against Schriro, upon which the court has already granted the defendants' Motion for Summary Judgment, on account of the absence of sufficient evidence showing Schriro's personal involvement.

Additionally, the court notes that, on account of its determination that summary judgment is warranted on Burns' due process claims, the court does not address whether the doctrine of qualified immunity shields the defendants from liability in connection with those claims.